**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE RICHARD K. EATON, JUDGE

| | |
|---|---|
| PASTIFICIO LUCIO GAROFALO S.P.A.,<br>Plaintiff,<br><br>and<br><br>LA MOLISANA, S.P.A.,<br>Consolidated Plaintiff,<br><br>v.<br><br>UNITED STATES,<br>Defendant. | Court No. 26-02686 |

**MEMORANDUM OF LAW IN SUPPORT OF THE RULE 56.2 MOTION OF PLAINTIFFS FOR JUDGMENT UPON THE AGENCY RECORD**

David J. Craven
Craven Trade Law LLC
3744 N Ashland
Chicago, IL 60613
(773) 245-4010
David.craven@tradelaw.com

Counsel to Pastificio Lucio Garofalo S.p.A and La Molisana, S.p.A

Dated: October 8, 2026

# Table of Contents

**Page**

Table of Contents ..... i

Table of Authorities ..... ii

Introduction ..... 1

Statement Pursuant To Rule 56.2(C) ..... 1

A. Administrative Determination Under Review ..... 1

B. Issues Of Law ..... 2

Statement Of Facts ..... 3

Summary Of Arguments ..... 4

Standard Of Review ..... 4

Argument ..... 8

I. 19 U.S.C. 1677f-1 (D)(1)(B) Only Expressly Permits Commerce To Use The Differential Pricing Analysis In An Investigation, Not In An Administrative Review ..... 8

II. Commerce Failed To Consider The Factual Circumstances Of This Administrative Review And Failed To Reasonably Apply The Differential Pricing Analysis ..... 12

III. Commerce's Application Of The 33% Ratio Test Is Invalid ..... 21

Conclusion ..... 24

# Table Of Authorities

**Page(s)**

**Cases**

*Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984) ....................5

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281 (1974)....................7

*Brookside Veneers, Ltd. v. United States*, 847 F.2d 786 (Fed. Cir. 1988) ....................7

*Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367 (Fed. Cir. 2012) ....................7

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).................... 5, 10, 12

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)....................5

*Creswell Trading Co. v. United States*, 15 F.3d 1054 (Fed. Cir. 1994) ....................21

*Diversified Prods. Corp. v. United States*, 6 CIT 155 (1983) ....................6

*Gerald Metals, Inc. v. United States*, 132 F.3d 716 (Fed. Cir. 1997) ....................6

*JBF RAK LLC v. United States*, 790 F.3d 1358 (Fed. Cir. 2015)...... 9, 10, 11, 18

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024).................... 5, 10

*Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009) ....................6

*Maquilacero S.A. de C.V. v. United States*, Consol. Ct. No. 23-00091, Slip Op. 26-111 (Ct. Int'l Trade Sept. 14, 2026)....................12

*Mid Continent Steel & Wire, Inc. v. United States*, 940 F.3d 662 (Fed. Cir. 2019)....................12

*Novosteel SA v. United States*, 284 F.3d 1261 (Fed. Cir. 2002)....................6

*Perrin v. United States*, 444 U.S. 37 (1979) ....................7

*Precision Specialty Metals, Inc. v. United States*, 116 F. Supp. 2d 1350 (Ct. Int'l Trade 2000)....................7

*Qingdao Taifa Grp. Co. v. United States*, 780 F. Supp. 2d 1342 (Ct. Int'l Trade 2011)....................14

*SKF USA, Inc. v. United States*, 254 F.3d 1022 (Fed. Cir. 2001) ....................6

*Stupp Corp. v. United States*, 5 F.4th 1341 (Fed. Cir. 2021) .................... 12, 23

*Timken Co. v. United States*, Consol. Ct. No. 12-00415, Slip Op. 14-24 (Ct. Int'l Trade Feb. 27, 2014) ....................14

*Toyo Kohan Co. v. United States*, Ct. No. 24-00261, Slip Op. 26-54 (Ct. Int'l Trade May 2, 2026) ....................13

*Tung Mung Dev. Co. v. United States*, 354 F.3d 1371 (Fed. Cir. 2004) ....................6

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ....................5, 6

*USX Corp. v. United States*, 11 CIT 82, 655 F. Supp. 487 (1987) ....................6

**Statutes**

19 U.S.C. § 1516a(a)(2)(B)(iii) ....................1

19 U.S.C. § 1516a(b) ....................4

19 U.S.C. § 1673d(c)(5) ....................4

19 U.S.C. § 1677f-1(d)(1)(B) .................... 1, 4, 8, 12, 13, 22

**Regulations**

19 C.F.R. § 351.224(g) ....................17

19 C.F.R. § 351.525(d) ....................17

**Administrative Determinations**

*Certain Pasta from Italy: Final Results of Antidumping Duty Administrative Review; 2023–2024*, 91 Fed. Reg. 12582 (Mar. 16, 2026) .................... 1, 2, 3

*Certain Pasta from Italy: Preliminary Results and Rescission, in Part, of Antidumping Duty Administrative Review; 2023–2024*, 90 Fed. Reg. 4273 (Sept. 4, 2025) ....................3

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 89 Fed. Reg. 60035 (Aug. 14, 2024) ....................3

*Non-Application of Previously Withdrawn Regulatory Provisions Governing Targeted Dumping in Antidumping Duty Investigations*, 79 Fed. Reg. 22371 (Apr. 22, 2014) ....................11

*Polyethylene Terephthalate Film, Sheet, and Strip from the United Arab Emirates*, 78 Fed. Reg. 29,700 (May 21, 2013) ....................11

**Other Authorities**

Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, vol. 1 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040 .................................................. 13, 20

## INTRODUCTION

This is an appeal from the Final Results of the Antidumping Duty Administrative Review of *Certain Pasta From Italy*. *Certain Pasta From Italy: Final Results of Antidumping Duty Administrative Review; 2023-2024 at 91 Fed. Reg. 12582 (March 16, 2026)* (P.R.12) Plaintiff Pastificio Lucio Garofalo SpA ("Garofalo") and Consolidated Plaintiff La Molisana, SpA ("La Molisana") (collectively, Plaintiffs) were designated as mandatory respondents and were active participants in the review.

Plaintiffs assert the following errors in the Department of Commerce ("Commerce")'s final results:

- Commerce arbitrarily used a two-percent test to determine whether prices differ significantly under 19 U.S.C. § 1677f-1(d)(1)(B)(i). Commerce failed to apply the mandated case-by-case directive of the law. Based on the facts of this case, Commerce should have used a 25% band on the weighted-average net price for a given purchaser, region, or time period.
- Commerce should revert to the established 66% ratio test.

## STATEMENT PURSUANT TO RULE 56.2(C)

### A. Administrative Determination Under Review

This action is brought pursuant to 19 U.S.C. § 1516a (a)(2)(B)(iii) to contest Commerce's final determination in its administrative review of certain pasta from

Italy, published as *Certain Pasta from Italy: Final Results of Antidumping Duty Administrative Review; 2023-2024*, 91 Fed. Reg. 12582 (March 16, 2026) (P.R.14[1]) and Issues and Decision Memorandum ("IDM") accompanying Commerce's Final Determination (P.R.13). In the Final Results, Commerce assigned a dumping margin rate of 2.65% to La Molisana and a dumping margin rate of 7% to Garofalo (P.R.14).

### B. Issues of Law

Commerce's determination was not based on substantial evidence on the record, and was arbitrary and capricious, an abuse of discretion, and not otherwise in accordance with law. The issue is:

1. *Whether Commerce lawfully and reasonably applied the differential pricing in the underlying administrative review*

The statute that permits a differential pricing analysis only expressly references investigations, not reviews. In the differential pricing analysis, Commerce arbitrarily applied the two-percent test to determine "significant differences," while ignoring the express definition of "significant" as 25% in this review. Further, Commerce failed to consider that products under the same shape category have

[1] This brief uses the following abbreviations: **P.R.** = Public Record; **C.R.** = confidential record; **AFA** = adverse facts available;

different prices. Commerce also erred by substituting a 33% standard for the well-established 67% in the ratio test without sufficient explanation.

## STATEMENT OF FACTS

Commerce initiated this review in response to a request for review filed by the U.S. domestic industry on July 31, 2024 (P.R.324). *See Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 89 Fed. Reg. 60035 (August 14, 2024) (P.R.317). On September 4, 2025, Commerce published the preliminary results as *Certain Pasta from Italy: Preliminary Results and Rescission, in Part, of Antidumping Duty Administrative Review; 2023–2024,* 90 Fed. Reg. 4273 (September 4, 2025) (P.R.103). Plaintiffs were preliminarily assigned a rate based on Adverse Facts of 91.74%. *Id*.

On December 31, 2025, Commerce published a post-preliminary analysis and revised the preliminary rate to: (1) Garofalo at 13.89% and (2) La Molisana at 2.26% (Memorandum, "Post-Preliminary Analysis for the 2023–2024 Administrative Review of Pasta from Italy" (December. 31, 2025) ("Post-Prelim. Analysis"), P.R.46). On March 12, 2026, Commerce issued the final results (P.R.14) and an Issues and Decision Memorandum explaining the decision (P.R.13). On March 16, 2026, these results were published in the Federal Register as *Certain Pasta from Italy: Final Results of Antidumping Duty Administrative Review; 2023–2024*, 91 Fed. Reg. 12582 (March 16, 2026) (P.R.12). In the final results, Commerce revised

Plaintiffs' rates from the post-preliminary analysis: (1) Garofalo from 13.89% to 7% and (2) La Molisana from 2.26% to 2.65%. *Id*. There are no facts in dispute in this matter; rather, this Court's decision turns on legal argument and whether Commerce failed to properly apply its differential pricing methodology, failed to take into account the specific facts of this review and failed to explain its deviation from past practices.

## SUMMARY OF ARGUMENTS

- The plain language of 19 U.S.C. 1677f-1 (d)(1)(B) does not expressly authorize the use of the differential pricing analysis for administrative review. This Court should revisit whether there is a gap in the statute. It is Plaintiffs' contention that, based on the statute's plain language, there is no gap in the statute, and different pricing analysis should only be applied to investigations.
- Commerce's application of the differential pricing analysis ignores and overlooks critical facts of this administrative review. Commerce arbitrarily used the two-percent band as the basis for "significant" difference under the meaning of 19 U.S.C. § 1677f-1(d)(1)(B)(i) and even contrary to its own definition of "significant," overlooking the definitions in the record and that products classified under the same shape category have different prices.
- Commerce's use of the 33% ratio test is invalid because such a ratio test intentionally lowers the threshold for Commerce to find a "pattern" under 19 U.S.C. § 1677f-1(d)(1)(B), which Commerce used to justify the application of the A-T test. Further, Commerce failed to justify its use of the 33% ratio test, even though it had previously used the 66% ratio test.

## STANDARD OF REVIEW

The Court will hold unlawful Commerce determinations that are unsupported by substantial evidence on the record or are not otherwise in accordance with law. 19 U.S.C. §1516a(b). To determine whether Commerce's interpretation and

application of 19 U.S.C. §1673d(c)(5) is "in accordance with law," the courts review the statute to determine whether Congress has directly spoken to the precise question at issue.

If the statute is silent or ambiguous with respect to the specific issue, the Supreme Court has held that it is the responsibility of the Federal Courts to determine the meaning of the law. *Loper Bright Enterprises v. Raimondo, 603 U.S. 369 (2024). Loper* stated in relevant part "*Chevron* is overruled. Courts must exercise their dependent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright* 144 S.Ct. 2244 at 2273.

Furthermore, once the statute has been properly interpreted by the Court, the question is then whether the decision is supported by substantial evidence. Substantial evidence is well defined by Court precedent. Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951), *quoting Consolidated Edison Corp. v. Labor Board*, 305 U.S. 197, 229 (1938). Furthermore, "substantial evidence" must be measured by the record as a whole, "including whatever fairly detracts from the substantiality of the evidence." *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) (quotations omitted). Thus, "it is appropriate to set aside the ITA's decision when the court 'cannot conscientiously find that the evidence

supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to {that} view.'" *Diversified Products Corp. v. United States*, 6 CIT 155, 161 (1983) *quoting Universal Camera*, 340 U.S. at 488.

Moreover, Commerce's determination cannot be based on "isolated tidbits of data which suggest a result contrary to the clear weight of the evidence." *USX Corp. v. United States*, 11 CIT 82, 84, 655 F. Supp. 487, 489 (1987). The substantial evidence standard requires more than mere assertion of 'evidence which in and of itself justified {the determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.'" *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (citation omitted).

Moreover, when substantial evidence is not utilized, such action is tantamount to the use of speculation in making a determination. *See Lucent Techs., Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1327 (Fed. Cir. 2009) ("It is well established that speculation does not constitute 'substantial evidence.'" (quoting *Novosteel SA v. United States,* 284 F. 3d 1261, 1276 (Fed. Cir. 2002) (internal quotation marks omitted)).

It is axiomatic that Commerce may not exert its authority in an arbitrary or capricious manner. *See, e.g., Tung Mung Dev. Co., v. United States*, 354 F.3d 1371, 1378 (Fed. Cir. 2004). Commerce's decision will be set aside if it is arbitrary and

capricious. *See, e.g., SKF USA, Inc. v. United States.* 254 F.3d 1022, 1028 (Fed. Cir. 2001). "{A} reviewing court must apply both standards {substantial evidence, and arbitrary and capricious or contrary to law}, while "an agency's finding may be supported by substantial evidence," yet "nonetheless reflect arbitrary and capricious action." *Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States*, 701 F.3d 1367, 1377 (Fed. Cir. 2012) (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 284, 95 S. Ct. 438, 42 L. Ed. 2d 447 (1974)).

Words must be given their ordinary meaning. See *Precision Specialty Metals, Inc. v. United States*, 116 F.Supp.2d 1350 (Ct. Int'l Trade 2000) which states "When a word is undefined in a statute, the agency and the reviewing court normally give the undefined term its ordinary meaning. See *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning."). "To assist it in ascertaining the common meaning of a tariff term, the court may rely upon its own understanding of the terms used, and it may consult lexicographic and scientific authorities, dictionaries, and other reliable information sources." *Brookside Veneers, Ltd. v. United States*, 847 F.2d 786, 789 (Fed.Cir.1988)." (*Precision Specialty* at 1362.)

## ARGUMENT

### I. 19 U.S.C. 1677f-1 (d)(1)(B) Only Expressly Permits Commerce to Use the Differential Pricing Analysis in an Investigation, not in an Administrative Review.

For Commerce to act, it must have statutory authority. The relevant provision of law is 19 U.S.C. 1677f-1 (d)(1)(B). This provision is clear and unambiguous. This provision reads in relevant part:

> (d) Determination of less than fair value
>
> (1)Investigations
>
> (A) In general
>
> In an investigation under part II of this subtitle, the administering authority shall determine whether the subject merchandise is being sold in the United States at less than fair value—
>
> (i) by comparing the weighted average of the normal values to the weighted average of the export prices (and constructed export prices) for comparable merchandise, or
>
> (ii) by comparing the normal values of individual transactions to the export prices (or constructed export prices) of individual transactions for comparable merchandise.
>
> (B)Exception
>
> The administering authority may determine whether the subject merchandise is being sold in the United States at less than fair value by comparing the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise, if—
>
> (i) there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time, and

> (ii) the administering authority explains why such differences cannot be taken into account using a method described in paragraph (1)(A)(i) or (ii).

This provision, by its express language, applies to investigations, not reviews, but Commerce has elected to apply it to reviews simply because an administrative review is "analogous" to an investigation and the differential pricing analysis is "instructive " (Post-Prelim. Analysis at 3, P.R.46).

This issue was previously considered by the Court of International Trade and the U.S. Court of Appeals for the Federal Circuit. The seminal opinion is *JBF RAK LLC. v. United States,* 790 F.3d 1358 (Fed. Cir. 2015). In the *JBF RAK* case the Federal Circuit held:

> Pursuant to 19 C.F.R. § 351.414(b) (2012), "[c]omparison of normal value with export price (constructed export price)," there are three methods by which value may be compared to export price or constructed export price: (1) average-to-average: "a comparison of the weighted average of the normal values with the weighted average of the export prices (and constructed export prices) for comparable merchandise;" (2) transaction-to-transaction: "a comparison of the normal values of individual transactions with the export prices (or constructed export prices) of individual transactions for comparable merchandise;" and (3) average-to-transaction: "a comparison of the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise." 19 C.F.R. § 351.414(b)(1)-(3). The regulation also states that in choosing the method of review *"in an investigation* or review, [Commerce] will use the average to-average method unless [it] determines another method is

> appropriate in a particular case." *Id.* at § 351.414(c)(1) (emphasis added).
>
> Here, Commerce "exercised its gap-filling discretion by applying a comparison methodology{, i.e. the average-to-transaction comparison method,} in reviews that parallels the methodology used in investigations." *JBF RAK.* 991 F,Supp.2d at 1347. JBF RAK points to no authority that contradicts this practice. Thus, contrary to JBF RAK's claims, Commerce's decision to apply its average-to-transaction comparison methodology in the context of an administrative review is reasonable. Because Congress did not provide for a direct methodology, Commerce properly "fill{ed} th{at} gap." *Chevron.* 467 U.S, at 843, 104 S.Ct. 277

*JBF RAK LLC* at 1364.

Thus, the entire underpinning of the *JBF RAK* opinion was the finding of a gap and filling of this gap by Commerce using *Chevron* deference. This is critical in the case at bar, as much of Commerce's support for its decision to use the alternate methodology is based on the concept of filling in the gaps.

While *JBF RAK* was not expressly overturned by *Loper*, and in fact, *Loper* expressly did not specifically overturn prior determinations, holding that *stare decisis* would continue to apply to prior decisions made under *Chevron*, Plaintiffs submit that the principle of *stare decisis* does not apply to this case and the finding in *JBF* can be distinguished. The *JBF RAK* opinion was issued in 2015 and was based on the 2012 regulations. The decisionrelated to the regulations in place at the time that the administrative decision was made. *JBF RAK v. United States,* 790 F.3d

1358, 1362 (Fed. Cir. 2015). The final administrative decision was issued on May 21, 2013 *Polyethylene Terephthalate Film, Sheet, and Strip from the United Arab Emirates,* 78 Fed. Reg. 29,700 (May 21, 2013). However, the differential pricing regulations were impacted by the final rule issued by Commerce on April 22, 2014 (*Non-Application of Previously Withdrawn Regulatory Provisions Governing Targeted Dumping in Antidumping Duty Investigations.* 79 Fed. Reg. 22371 (April 22, 2014)) and critically, the interpretations have also changed as a result of the rejection of Cohen's D test. In fact, Commerce is applying in this review an essentially new and different test for such analysis. As such, the *JBF RAK* decision was not expressly considering the same regulations; it is not necessarily controlling, and *stare decisis* should not apply.

Accordingly, this Court should consider the plain language of the statute, whether there is a gap in the statute, and if so, whether Commerce's filling of the gap. We submit that, based on the plain language of the statute, there is no gap and thus the new regulation filling the gap is unnecessary.

Accordingly, this Court should revisit the issue of whether there is a gap in the statute and, if so, whether the gap was properly filed. Plaintiffs submit that the plain language of the statute makes it clear that differential pricing analysis should apply only to investigations.

## II. Commerce Failed to Consider the Factual Circumstances of This Administrative Review and Failed to Reasonably Apply the Differential Pricing Analysis

Even if the Court finds that Commerce is entitled to apply a differential pricing analysis, this does not mean that any application of such analysis is lawful. As an initial matter, the standard of review for Commerce's use and application of the differential pricing analysis is reasonableness. *Maquilacero S.A. de C.V. v. United States*, Ct. No. 23-00091, Slip Op. 26-111, at 8 (Ct. Int'l Trade Sept. 14, 2026) (citing *Stupp Corp. v. United States*, 5 F.4th 1341, 1353 (Fed. Cir. 2021)) ("Our precedents make clear that the relevant standard for reviewing Commerce's selection of statistical tests and numerical cutoffs is reasonableness, not substantial evidence") (citing *Mid Continent Steel & Wire, Inc. v. United States*, 940 F.3d 662, 667 (Fed. Cir. 2019)) ("In carrying out its statutorily assigned tasks, Commerce has discretion to make reasonable choices within statutory constraints").

Under 19 U.S.C. § 1677f-1(d)(1)(B), Commerce cannot freely use the average-to-transaction method over the average-to-average method without providing sufficient reasoning. 19 U.S.C. § 1677f-1(d)(1)(B), when interpreted without *Chevron* deference, compels the use of the average-to-average method:

> (B)Exception
>
> The administering authority may determine whether the subject merchandise is being sold in the United States at less than fair value by comparing the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise, if—

> (i) there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time, and
>
> (ii) the administering authority explains why such differences cannot be taken into account using a method described in paragraph (1)(A)(i) or (ii).

In other words, under 19 U.S.C. § 1677f-1(d)(1)(B), Commerce may revert to the average-to-transaction method, as an **exception**, only if two conditions are satisfied:

1. There is a pattern of export prices or constructed export prices for a comparable merchandise that "**differ significantly** among purchasers, regions, or periods of time," and
2. Commerce must explain why such differences cannot be taken into account using the average-to-average method.

When interpreting the language of "differ significantly," the Statement of Administrative Action accompanying the Uruguay Round Agreements Act ("SAA") provides that Commerce's determination of "differ significantly" **must** be based on a "case-by-case basis."

> In addition, the Administration intends that in determining whether a pattern of significant price differences exist, Commerce will proceed on a case-by-case basis, because small differences may be significant for one industry or one type of product, but not for another.

SAA, H.R. Doc. No. 103-316, vol. 1, at 843 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4178). *See Toyo Kohan Co. v. United States*, Ct. No. 24-00261, Slip Op. 26-54, at 16 n.12 (Ct. Int'l Trade 2026) (quoting SAA at 843) ("[T]he Administration intends that in determining whether a pattern of significant price differences exist[,]

Commerce will proceed on a case-by-case-basis . . . ."); *see also Timken Co. v. United States*, Consol. Ct. No. 12-00415, Slip Op. 14-24, at 17 (Ct. Int'l Trade 2014) (quoting *Qingdao Taifa Grp. Co. v. United States*, 780 F. Supp. 2d 1342, 1350 (CIT 2011) (internal quotation marks omitted)) ("When making a discretionary determination {to use an alternative comparison methodology}, . . . Commerce can use a case-by-case analysis, so long as it is consistent with its statutory authority").

In its post-preliminary analysis, Commerce started its differential pricing analysis with the two-percent test without explaining how this was tied to this review and this order. According to Commerce, the two-percent test is characterized as "for comparable merchandise, the price difference test examines whether the weighted-average net price to a given purchaser, region or time period is within two percent of the weighted-average net price to all other purchasers, regions or time periods" (Post-Prelim. Analysis at 4, P.R.46). At this step, Commerce arbitrarily selected a two percent deviation band as a significant difference without providing any specific explanation for why two percent should be considered significant for this order and review. Instead, Commerce simply stated that the two percent is the threshold, without citing any court decision or even other administrative reviews or investigations. *Id*. In the post-preliminary analysis, Commerce found a significant difference for Plaintiffs without providing specific reasoning as to how or why Plaintiffs failed the two percent deviation band test. *Id*. at 5. In the final results,

Commerce upheld its application of the two-percent test (Memorandum, "Issues and Decision Memorandum for the Final Results of Antidumping Duty Administrative Review: Certain Pasta from Italy; 2023-2024" (December. 31, 2025) ("Final Results I&D Memo") at 14, P.R.13). *Ironically*, Commerce had an extensive discussion of how its application of the two-percent test was on a "case-by-case basis." (emphasis added).

> The test does not stipulate an absolute value as a threshold (*e.g.*, five U.S. dollars per kilogram), but a threshold that measures relative differences (*i.e.*, a percentage) on a case-by-case basis by a comparison to case-specific averages dependent upon the customer, region, and temporal data provided by the respondent, specific to the period under examination and to the merchandise, and thus, the market under consideration. Moreover, the "meaningful difference" test provides additional contextualization of the differential pricing analysis to the specific facts of each respondent. The question of whether the A-A method or the A-T method is warranted is specific to the segment of the proceeding, as well as the respondent under examination. If the selection of the A-T method does not result in a meaningful difference in the weighted-average dumping margins, then that is evidence that the respondent's pricing behavior in the U.S. market can be adequately addressed through the standard A-A methodology. Accordingly, Commerce's determination of whether the A-T method is permitted under section 777A(d)(1)(B) of the Act is determined on a case-specific basis.

*Id*. at 16.

While Commerce stated that the application of the two-percent test was not based on an "absolute threshold" but rather on the "specific facts of each respondent," it ignored critical facts and did not address any of the specific facts in this review and this order.

First, as stated in both La Molisana and Garofalo's case briefs, the price of pasta, as an agricultural product, fluctuates with the cost of the raw material (Garofalo's Post-Preliminary Case Brief at 7, P.R.36) and (La Molisana's Post-Preliminary Case Brief at 3, P.R.37). As stated in the case briefs and post-preliminary comments, pasta does not have high profit margins compared to other industrial products, and critically, its price is closely tied to the price of raw materials, namely semolina (Garofalo's Post-Preliminary Case Brief at 7, P.R.36) and (La Molisana's Post-Preliminary Case Brief at 3, P.R.37). When the price of raw materials changes, the price of pasta changes accordingly. *Id*. This is readily recognized by Commerce. For both mandatory respondents, Commerce requested that they submit data on the price of the primary raw material, semolina, on a quarterly basis to determine whether the changes were **significant** (Quarterly Cost Supplemental Questionnaire, P.R.158 and P.R.159). Commerce stated

> If the change between the high and low quarterly cost of manufacturing (*i.e.*, (high COM - low COM) / low COM) for the majority of the CONNUMs reported above is **significant** (*i.e.*, greater than 25 percent for a 12-month POR or in case of a POR longer than 12 months, 25 percent for the 12-month period plus 6.25 percent for each quarter thereafter)

*Id*. at 5. (emphasis added).

In other words, IN THIS CASE, Commerce, using its very own words, has expressly defined **significant** as 25%. (emphasis added). Commerce did not explain why it expressly defined the term "significant" as 25% for one purpose, but ignored

it for another purpose. This is intriguing, particularly here: the first definition of 25% was direct and provided during the information-gathering phase, while the 2% standard was simply provided in the decision without any tie to the actual information. Simply put, notwithstanding the directive to make the differential pricing determination on a case-by-case basis, Commerce failed to take into account its own express standard for "significant" provided in this case.

Second, the term "significant" is also defined in other portions of Commerce's regulations. Such regulations include numerous situations where a change must be at least 25 percent to be considered "significant," and a number of these applied to the facts in this review. For example, a ministerial error is defined as "significant" under 19 C.F.R. § 351.224(g) only when a correction of the error would alter the margin by at least 25 percent. While no ministerial errors were alleged in this review, had they been so alleged, they would have been judged in the context of the 25% standard as to whether they were significant, not the 2% standard.

In another example, which was directly considered by Commerce in this review, 19 C.F.R. §351.525(d) addresses the issue of whether or not a country under examination is experiencing "high" inflation. Commerce applies a "greater than 25 percent per annum "standard" in making such a test. Such a standard was applied to both mandatory respondents, as the questionnaire expressly raised this issue and

stated the 25% standard applied to determine whether inflation was significant (Initial Questionnaire to Garofalo at 28, P.R.292) and (Initial Questionnaire to La Molisana at 29, P.R.294).

Even though Plaintiffs raised these issues, Commerce did not address them in the final results. Rather, Commerce discussed extensively how it can utilize the two-percent test. There is no evidence that Commerce actually considered the facts of this administrative review and the unique situation as recognized by Commerce when it requested quarterly costs. Instead, in the final results, Commerce stated that there is "no statutory requirement" for it to examine the "reasons underlying the price difference" (Final Results I&D Memo at 17, P.R.13). To support its position, Commerce cited *JBF RAK LLC*, where the Federal Circuit stated:

> Section 1677f-1(d)(1)(B) does not require Commerce to determine the reasons why there is a pattern of export prices for comparable merchandise that differs significantly among purchasers, regions, or time periods, nor does it mandate which comparison methods Commerce must use in administrative reviews. As a result, Commerce looks to its practices in antidumping duty investigations for guidance.

*JBF RAK LLC*, 790 F.3d at 1368.

This argument, however, ignores the express language defining the term "significant" in the context of this review and seeks to convert Plaintiffs' arguments into simple arguments about the reason for the price difference, not whether such changes are significant.

In addition to Commerce's summary dismissal of the semolina price, Commerce also overlooked the prices of both mandatory respondent's products, which further made Commerce's application of the two-percent rule unreasonable in this administrative review. Instead of evaluating Garofalo's products on a product-by-product basis, Commerce arbitrarily classified all its products into nine shape categories (Initial Questionnaire to Garofalo at B-8 and C-7, P.R.292). However, products classified under a single shape category do not all have the same price. This is illustrated by sequence numbers 23, 26, 28, and 29 in the U.S. database. *See* "Certain Dry Pasta from Italy (A-475-818): Response to Second Section A, B, C, and D Supplemental Questionnaire" (June 23, 2025) (C.R.91), U.S. Database (C.R.89). Products with sequence numbers 23, 26, 28, and 29 are in a single shape category, CONNUM [ ], and are sold to the same customer, [ ], on the same invoice. *Id*. Specifically, the products [ ] were sold at a gross unit price of [ ], while the products [ ] were sold at a gross unit price of [ ]. *Id*. The gross unit price differences indicate that [ ] and [ ] are not identical or similar products, as the same customer was willing to pay different prices on the same invoice.

In a similar fashion, La Molisana had a similar pattern of sales. Commerce also overlooked the prices of La Molisana's products, which further made Commerce's application of the two-percent rule unreasonable in this administrative review. Instead of evaluating La Molisana's products on a product-by-product basis,

Commerce arbitrarily classified all its products into nine shape categories. (Initial Questionnaire to La Molisana at B-8 and C-7, P.R.294). However, products classified under a single shape category do not all have the same price. This is illustrated by sequence numbers 1569,1570 and 1831. *See* "Certain Dry Pasta from Italy (A-475-818): Response to Second Supplemental Questionnaire" (C.R.120), U.S. Database (C.R.114). Products with Sequence Numbers 1569, 1570, and 1831 are in a single shape category, CONNUM [ ], and are sold to the same customer, [ ], on the same invoice [ ]. *Id*.

Specifically, the products [ ] were sold at a gross unit price of [ ], while the product [ ] was sold at a gross unit price of [ ]. *Id.* These are distinct products because the same customer was willing to pay different prices on the same invoice. Under Commerce's arbitrary product classification rule, these products are classified under the same shape category and analyzed as if they are the same product in the two-percent test. This is also a direct contradiction of the SAA's "case-by-case" requirement. In the final results, Commerce failed to explain how products in the same shape category but with different prices would affect the two-percent test analysis. In essence, Commerce unlawfully used its own arbitrary shape categories and overlooked the facts of this administrative review when applying the two-percent test.

It has long been Commerce's practice that a "pattern" within the meaning of the statute exists only when apparent price differences are beyond something that might occur by chance. That is, a "pattern of prices that differ significantly among purchasers, regions, or time periods" means that Commerce should examine the extent to which the prices, when ordered by purchaser, region or time period, exhibit differences that have meaning, that have or may have influence or effect, that are noticeably or measurably large, and that may be beyond something that occurs merely by chance. The burden is on Commerce to establish that the results of its analysis are not arbitrary but are based on a recognizable pattern grounded in substantial evidence. See *Cresswell Trading Co., Inc. v. United States*, 15 F.3d 1054 (Fed. Cir. 1994). A "pattern" exists within the meaning of the statute only when the evidence allows it to reject the hypothesis that any observed price differences reflect nothing more than random fluctuations, and Commerce's new test is not based on this principle.

## III. Commerce's Application of the 33% Ratio Test is Invalid

Simply put, Commerce's ratio test is inconsistent with the statute. Commerce is permitted to compare weighted-average normal values to individual export prices or constructed export prices (the A-T method) only if Commerce finds that "there is a pattern of export prices (or constructed export prices) for comparable

merchandise that differ significantly among purchasers, regions, or periods of time." 19 U.S.C. § 1677f-1(d)(1)(B)(i). In order to apply the A-T method, Commerce must find "a pattern" of prices that differ significantly either among purchasers, among regions, or among periods of time. *Id*. Under its new test, Commerce incorrectly applied the ratio test conjunctively (examining whether there is a pattern of prices that differ significantly among purchases, regions, and time periods). The statute, in contrast, is disjunctive ("or" rather than "and"); it requires a pattern of prices that differ significantly "among purchasers, regions, or period of time …".

This error is not simply grammatical. Under the ratio test, Commerce (1) "calculates the ratio of the total value of sales that pass the price difference test to the total value of sales by the respondent in the United States during the period of review," and (2) "if more than 33 percent of the total value of U.S. sales passes the price difference test, then Commerce will find that a pattern of price differences existed during the period of review" (Post-Prelim. Analysis at 4, P.R.46). In other words, Commerce calculates a single combined ratio in which the numerator consists of all sales that pass the two percent test for any of the three categories (purchasers, regions, and periods of time) and the denominator consists of all sales. To be consistent with the statute, Commerce must instead find a pattern of significant price differences among "purchasers, regions, or periods of time" by calculating separate

ratios for each of these groups. The practical impact of this error is that Commerce has lowered the threshold set forth in the statute for finding a "pattern" and, thus, for applying the exceptional A-T price comparison method.

Furthermore, Commerce has reduced the threshold for the application of the A-T price comparison method to all sales to 33%. This is inconsistent with the position taken by Commerce in *Stupp Corporation v. United States,* 5 F.4th 1341, 1333 (Fed. Cir. 2021). There, Commerce stated that it was reasonable to apply the A-T method to all sales if it found **66%** of sales were "significantly different" because "when two thirds or more of a respondent's sales are at prices that differ significantly, then the extent of these sales is so pervasive that" the normal average to average method would not permit Commerce "to separate the effect of the sales where prices differ significantly from those where prices do not differ significantly." *Id*. Commerce also stated that when it "finds that between one third and two thirds of U.S. sales are at prices that differ significantly … the effect of this pattern can reasonably be separated from sales whose prices do not differ significantly." *Id*. Commerce has provided no justification for why this rationale no longer applies and why it now is appropriate to apply the A-T method when it finds that merely 33% of sales "differ significantly." Commerce needs to sufficiently explain why its previous rationale no longer applies or why it must discontinue its new approach.

## CONCLUSION

This Court should remand this matter and direct that Commerce modify its approach and use 25 percent instead of two percent in the "price difference test" to determine whether prices differ significantly. Specifically, Commerce should determine that the weighted-average net price to a given purchaser, region, or time period will "differ significantly" only when that price falls outside of a plus or minus 25 percent band around the weighted-average net price to all other purchasers, regions, or time periods. Commerce should also revert to the established 66% ratio test. Such decisions would be consistent with Court precedent and the facts of this case.

Respectfully submitted,

/s/ David J. Craven

David J. Craven
Craven Trade Law LLC
3744 N Ashland
Chicago, IL 60613
(773) 245-4010
David.craven@tradelaw.com

*Counsel to* Pastificio Lucio Garofalo SpA and La Molisana, SpA

Dated: October 8, 2026

**CERTIFICATE OF COMPLIANCE**

1. This brief complies with the guidelines set forth in the Standard Chambers Procedures. The brief 5,597 on numbered pages (that is, excluding only the Cover Page, the Table of Contents, the Table of Authorities, and the signature block).

2. This brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

/s/ David J. Craven

David J. Craven
Craven Trade Law LLC
3744 N Ashland
Chicago, IL 60613
(773) 245-4010
David.craven@tradelaw.com

*Counsel to* Pastificio Lucio Garofalo S.p.A and La Molisana, S.p.A

Dated: October 8, 2026